UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFREY CRASS, *Individually and on Behalf of All Others Similarly Situated*,

                     Plaintiff,

-v-

YALLA GROUP LIMITED and TAO YANG,

                     Defendants.

21 Civ. 6854 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision appoints lead plaintiffs and counsel in a putative securities class action. On August 13, 2021, plaintiff Jeffrey Crass ("Crass") filed this action under the federal securities laws on behalf of purchasers of Yalla Group Limited ("Yalla") securities. Crass claimed, *inter alia*, that, in connection with the company's initial public stock offering ("IPO"), Yalla and its chairman and chief executive officer Tao Yang ("Yang") had made false and misleading statements, and omitted material facts, which tended to conceal that Yalla's user metrics, reported revenues, and cash balance were substantially lower than publicly represented. Crass alleged that, as a result, he and the putative class had bought Yalla securities at a premium. Crass further alleges that, when a report published by Swan Street Research ("Swan Street") was released and revealed that Yalla's finances and user metrics had been inflated, Yalla's share value dropped substantially, harming him and the putative class.

After Crass filed suit, five movants—ultimately not including Crass—sought appointment as lead plaintiff. Pending now are two motions for such appointment and for appointment of lead counsel. One is a joint motion from Peifa Xu ("Xu") and Yongjun Li ("Li") (together, the "Xu Group"); the other is from Gang Wang ("Wang"). The Xu Group represents

that both individually and together, its two members had the largest financial interest of the movants and contends that they are adequate and typical to represent the putative class, as Federal Rule of Civil Procedure 23 requires. Dkt. 36 ("Xu Group MOL") at 2. Wang does not contend that he had the largest interest, but he argues that the Xu Group is inadequate and atypical. Dkt. 37 ("Wang MOL") at 6. The other movants have filed notices of withdrawal or indicating that they do not oppose the pending motions.[1]

For the reasons that follow, the Court grants the Xu Group's motion, and appoints (1) Xu and Li as lead plaintiffs; and (2) Pomerantz LLP as lead counsel.

**I.      Background**

**A.      The Complaint's Allegations[2]**

Yalla is a holding company organized under the laws of the Cayman Islands and headquartered in the United Arab Emirates. Compl. ¶ 2. It produces a voice-centric social networking and entertainment platform that operates mainly in the Middle East and Northern Africa region ("MENA"). *Id.* ¶ 3. On September 30, 2020, Yalla undertook an IPO. *Id.* ¶ 4. The IPO consisted of an offering of $18.6 million American Depositary Shares ("ADS"), each representing one Class A ordinary share, at $7.50 per ADS. *Id.* Yalla's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "YALA." *Id.* ¶ 2.

Plaintiffs here challenge two related sets of allegedly false and/or misleading statements by Yalla—first, that its user base was as large as it represented; and second, that, based on that

---

[1] *See* Notice of Non-Opposition of Steve Hu and Yechen Dong, Dkt. 33 Notice of Withdrawal of Motino to Appoint Scott A. Monett, Dkt. 34; Notice of Non-Opposition of Simon Zhu, Dkt. 38.

[2] The following facts are drawn from Crass' Complaint, Dkt. 1 ("Compl."), and the parties' submissions on the lead plaintiff motions. The Court accepts these facts as true solely for the purpose of resolving these motions.

2

inflated user base, its finances were strong and it had prospects for strong financial growth. Such statements were allegedly repeated in documents submitted to the SEC and in earnings calls throughout the class period, including the following.

On September 29, 2020, Yalla's final registration statement in connection with the IPO became effective. *Id.* ¶ 23. There, Yalla represented its user base as follows:

> Today, we are the largest voice-centric social networking and entertainment platform in MENA as measured by revenue in 2019, according to the Frost & Sullivan Report. We have built a large and vibrant Yalla community. In the second quarter of 2020, approximately 12.5 million users visited our platform on average each month; they spent a total of 309.5 million hours in our live voice chat rooms, or Yalla rooms, and played a total of 407.2 million rounds of casual games on Yalla Ludo. The number of paying users on our platform was 5.4 million in the second quarter of 2020. On average, active users of Yalla and Yalla Ludo spent approximately 4.5 hours and 1.4 hours on our platform every day in the second quarter of 2020, respectively.

*Id.* ¶ 24. The registration statement touted the company's financial performance, including statements regarding revenue growth and income: "Our revenues increased by 99.6% from US$26.4 million in the six months ended June 30, 2019 to US$52.8 million in the six months ended June 30, 2020" and "[o]ur net income was US$20.2 million and US$28.9 million in 2018 and 2019, respectively, and our net margin was 47.8% and 45.6% in 2018 and 2019, respectively. Our net income was US$11.4 million and US$25.2 million in the six months ended June 30, 2019 and 2020, respectively, and our net margin was 43.3% and 47.8% in the six months ended June 30, 2019 and 2020, respectively." *Id.* ¶¶ 27–28. Yalla attributed its financial growth to the "increase of paying users of Yalla, which grew from 789.5 thousand in the three months ended June 30, 2019 to 1.1 million in the same period in 2020," and the increase in average revenues per paying users as a result of the growth in its user base. *Id.* ¶ 28.

On November 9, 2020, Yalla filed a Form 6-K with the SEC. It again highlighted its revenue growth in the third quarter of 2020 as well as the user growth in terms of Average

3

Monthly Active Users ("Average MAUs") and "number of paying users." *Id.* ¶ 29. Yalla stated that its revenues were $33.8 million in the third quarter of 2020, that the Average MAUs had increased by 358.9% to 14.3 million in the third quarter from 3.1 million in the same period 2019, and that the number of paying users on its platform had increased by 894.9% to 5.1 million in the third quarter of 2020 from 0.5 million in the same period of 2019. *Id.* As to its financial outlook, Yalla stated that it expected "revenues to be between $35.0 million and US$36.0 million, which would represent an increase of approximately 81.6% to 86.8% from US$19.3 million for the fourth quarter of 2019." *Id.* ¶ 30.

The same day, November 9, 2020, Yalla hosted an earnings call and made similar representations. *Id.* ¶ 31.

On March 16, 2021, Yalla filed a Form 6-K with the SEC. It highlighted the Company's revenue growth in the fourth quarter of 2020 as well as the user growth in terms of Average MAUs and number of paying users. *Id.* ¶ 32. Yalla stated that its revenues were $48.3 million in the fourth quarter of 2020, representing an increase of 150.9% from the fourth quarter of 2019, that the Average MAUs had increased by 295.4% to 16.4 million in the fourth quarter from 4.2 million in the fourth quarter of 2019, and that the number of paying users on its platform had increased by 624.2% to 5.2 million. *Id.* As to its outlook, Yalla stated that it expected "revenues to be between $60.0 million and $63.0 million, which would represent an increase of approximately 184.7% to 198.9% from US$21.1 million for the first quarter of 2020." *Id.* ¶ 33.

On March 23, 2021, Yalla held an earnings call for the fourth quarter of 2020. *Id.* ¶ 34. On the call, Yang touted the company's user growth and the success of Yalla Ludo, an associated game platform. *Id.*

4

On May 12, 2021, Yalla filed a Form 6-K with the SEC, highlighting the company's revenue growth in the first quarter of 2021, again using the same Average MAUs and number of paying user metrics. *Id.* ¶ 35. Yalla stated that its revenues had been "67.6 million in the first quarter of 2021, representing an increase of 221.0% from the first quarter of 2020," that its Average MAUs had increased by 206.9% to 18.8 million in the first quarter of 2021 from 6.1 million in the first quarter of 2020, and that the number of paying users on its platform had increased by 260.4% to 5.8 million. *Id.* As to its outlook, Yalla stated that it expected revenues "to be between US$65.0 million and US$71.0 million, which would represent an increase of approximately 105.2% to 124.1% from US$31.7 million for the second quarter of 2020." *Id.* ¶ 36.

The Complaint alleges that each of the above statements were false and misleading because the company overstated its user metrics and revenue. *Id.* The Complaint alleges that the stock price fell after the "truth . . . emerg[ed]," by way of several research reports. *Id.* at 10.

First, on May 19, 2021, Swan Street published a report entitled, "Is Yalla Group a Multi $ Fraud? The 'Clubhouse of the Middle East' UAE Tech Unicorn that Never Was" (the "Swan Street Report"). *Id.* ¶ 38. The Swan Street Report stated, *inter alia*, that Yalla's user metrics were inflated fivefold, that it believed that about 50% of revenues and about 50% of Yalla's cash balances were likely fictitious, and that Yalla's financial statements could not be squared with known facts. *Id.* ¶ 39. The Swan Street Report based its conclusion regarding the inflated user-base metrics on Google Search data, SEMrush organic traffic, and SensorTower data, which, it claimed, revealed that most accounts were fake. *Id.* ¶ 40. The Swan Street Report also criticized on the track record of its auditor. *Id.* ¶ 41.

Yalla's share price fell $1.31 per share, or 7.15%, to close at $17.01 after the Swan Street Report was released. *Id.* ¶ 44. On May 19, 2021, the same day the Swan Street Report was released, Yalla issued a press statement denying the report's allegations as to its financial performance. *Id.* ¶ 45.

The next day, on May 20, 2021, the Bear Cave issued a report entitled "Problems at Yalla Group." *Id.* ¶ 46. Gotham City Research also tweeted that it was shorting Yalla. *Id.*

On this news, Yalla's share price that day fell on an additional 6%, and closed at $15.96. *Id.*

On August 9, 2021, Yalla issued a press release entitled, "Yalla Group Limited Announces Unaudited Second Quarter 2021 Financial Results" announcing its financial results for the second quarter of 2021. *Id.* ¶ 48. That night, Yalla held an earnings call with investors and analysts. *Id.*

Yalla's press release disclosed quarterly revenue of $66.62 million, which fell short of analysts' expectations. *Id.* ¶ 49. According to *The Motley Fool*, "[h]eading into Q2, Wall Street had forecast $0.17 per share in profit on sales of $68 million for Yalla. As it turned out, the company earned only $0.10 per share, and sales were $66.6 million." *Id.*

On this news, on August 10, 2021, the price of price of Yalla ADS fell nearly 18.9%, closing at $10.99, down from its previous close price of $13.55. *Id.* ¶ 50.

### B. Relevant Procedural History

#### 1. Crass' Complaint

On August 13, 2021, Crass filed a Complaint, Dkt. 1, and published a notice of this action on *BusinessWire*, *see* Dkt. 15, Ex. C, a "widely circulated national business-oriented . . . wire service," 15 U.S.C. § 78u–4(a)(3)(A)(i); *see also, e.g., In re Facebook, Inc., IPO Sec. &*

*Derivative Litig.*, 288 F.R.D. 26, 32 (S.D.N.Y. 2012) (*BusinessWire* is "a widely-circulated, national, business-orientated news reporting wire service"). As noted, it alleges that Yalla and Yang made false and misleading statements and failed to disclose material, adverse facts about Yalla's user metrics and financial position, Compl. ¶ 5, which violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, *Id.* ¶ 1. The Complaint brings claims on behalf of a putative class consisting of all persons who purchased or otherwise acquired Yalla ADS between September 30, 2020 and August 9, 2021, and who were damaged thereby. *Id.*

### 2. Motions for Appointment of a Lead Plaintiff

On October 12, 2021, the deadline to move for appointment as lead plaintiff, five persons or groups moved to be appointed.[3] These were Steve Hu ("Hu") and Yechen Dong ("Dong"), Dkts. 13–15; Wang, Dkts. 16–18; Simon Zhu ("Zhu"), Dkts. 19–20, 23, 25; Scott A. Monett ("Monett"), Dkts. 21–22, 24, 26; and the Xu Group, Dkts. 27–30.

On August 13, 2021, the Court issued an order directing that responses to the motions for appointment lead plaintiff were due on October 27, 2021. Dkt. 31. On October 26, 2021, Hu and Dong filed a notice of non-opposition to the competing motions for such appointment, Dkt. 33, and was followed by similar notices, on October 26 and 27, 2021, from Monett, Dkt. 34, and from Zhu, Dkt. 38.

---

[3] October 12, 2021 was the deadline because notice of the action was published on August 13, 2021. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II) ("[N]ot later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.").

## II. Selecting the Lead Plaintiff: The PSLRA Requirements

Motions for appointment of lead plaintiff and approval of lead counsel in putative class actions brought under the securities laws are governed by the Private Securities Litigation Reform Act ("PSLRA"). *See In re Millennial Media, Inc. Sec. Litig.*, 87 F. Supp. 3d 563, 568–69 (S.D.N.Y. 2015); *Bo Young Cha v. Kinross Gold Corp.*, No. 12 Civ. 1203 (PAE), 2012 WL 2025850, at *2 (S.D.N.Y. May 31, 2012). The PSLRA directs the Court to appoint as lead plaintiff the party or parties "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u–4(a)(3)(B)(i).

Under the PSLRA, there is a rebuttable presumption that the most adequate plaintiff is the person or group of persons that: (1) has either "filed the complaint or made a motion in response to a notice," *id.* § 78u–4(a)(3)(B)(iii)(I)(aa); (2) in the determination of the Court, has the "largest financial interest in the relief sought by the class," *id.* § 78u–4(a)(3)(B)(iii)(I)(bb); and (3) satisfies all the requirements of Federal Rule of Civil Procedure 23, which governs class actions, *see id.* § 78u–4(a)(3)(B)(iii)(I)(cc).

As the Xu Group and Wang are the only movants who continue to seek appointment as lead plaintiff and for appointment of their chosen counsel as lead co-counsel, the Court will consider only these two motions.

### A. Notice

Both sets of prospective lead plaintiffs satisfy the first requirement, as they timely moved for lead plaintiff status. *See* 15 U.S.C. § 78–u4(a)(3)(B)(iii)(I); *City of Monroe Emps. Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 269 F.R.D. 291, 293 (S.D.N.Y. 2010).[4]

---

[4] Because notice of the action was published on August 13, 2021, *see* Dkt. 15, Ex. C, the deadline to file a motion for appointment as lead plaintiff was October 12, 2021. 15 U.S.C. §

8

**B.     Financial Interest**

In determining which plaintiff has the largest financial stake in the litigation, courts in this Circuit have traditionally applied a four-factor test, first set forth in *Lax v. First Merchants Acceptance Corp.*, No. 97 Civ. 2715 (DHC), 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). These *Lax* factors include:

> (1) the total number of shares purchased during the class period;
> (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period);
> (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and
> (4) the approximate losses suffered.

*City of Monroe*, 269 F.R.D. at 293.

Of these factors, courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant. *See, e.g., Kaplan v. Gelfond*, 240 F.R.D. 88, 93 (S.D.N.Y. 2007) ("Although courts have differed on how much weight to assign to each of the *Lax* factors, we, as have other courts, shall place the most emphasis on the last of the four factors: the approximate loss suffered by the movant."), *reconsidered on other grounds, In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *Bo Young Cha*, 2012 WL 2025850, at *2; *Reimer v. Ambac Fin. Grp., Inc.*, No. 08 Civ. 411 (NRB), 2008 WL 2073931, at *3 (S.D.N.Y. May 9, 2008); *Bhojwani v. Pistiolis*, No. 06 Civ. 13761 (CM) (KNF), 2007 WL 2197836, at *6–7 (S.D.N.Y. July 31, 2007); *Strougo v. Brantley Capital Corp.*, 243 F.R.D. 100, 104–05 (S.D.N.Y. 2007); *see also Foley v. Transocean Ltd.*, 272 F.R.D. 126, 128 (S.D.N.Y.

---

78u-4(a)(3)(A)(i)(II). That day, the Xu Group and Wang timely filed their motions to serve as lead plaintiff(s).

2011) ("[I]n determining the largest financial interest, most courts simply determine which potential lead plaintiff has suffered the greatest total losses[.]" (quotation marks omitted)).

Here, the Xu Group represents that its two members suffered a combined $376,911 in losses, comprising $198,657 by Li and $178,253 by Xu, Dkt. 36 at 1. No other individual or entity—including Wang, the only remaining movant—has represented it has a greater financial interest in the relief sought by the class. The Xu Group asserts, and Wang does not dispute, that Wang suffered a loss of $109,801, below both those of Li and Xu. Dkt. 37 at 5.

That the Xu Group is a coalition of two individuals does not impair their bid. The PSLRA expressly permits "a group of persons" to be appointed lead plaintiff. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). And courts in this District have recognized that a small group may appropriately be appointed lead plaintiff. *See, e.g.*, *Janbary v. Canadian Solar, Inc.*, 272 F.R.D. 112, 119 (S.D.N.Y. 2010) (appointing as lead plaintiff a group of "sophisticated individuals who have demonstrated their intent to participate directly in this litigation and their willingness and ability to serve as class representatives"); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 391–92 (S.D.N.Y. 2008) ("[I]n this District . . . unrelated investors [may] join together as a group seeking lead-plaintiff status on a case-by-case basis, if such a grouping would best serve the class."); *but see Goldberger v. PXRE Grp., Ltd.*, 06 Civ. 3410 (KMK), 2007 WL 980417, at *3–5 (S.D.N.Y. Mar. 30, 2007) (declining to appoint a group of seven individual investors as lead plaintiff notwithstanding that, in the aggregate, the group had the largest financial interest in action).

To ascertain whether a lead plaintiff group is appropriate, courts generally consider three factors: "(1) the size of the group; (2) the relationship between the parties; and (3) any evidence that the group was formed in bad faith." *Peters v. Jinkosolar Holding Co.*, No. 11 Civ. 7133

(JPO), 2012 WL 946875, at *7 (S.D.N.Y. Mar. 19, 2012); *see also Varghese*, 589 F. Supp. 2d at 392 (describing factors as "(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa").

By those standards, the Xu Group is qualified for appointment. First, the group is "relatively small and therefore presumptively cohesive." *Janbay*, 272 F.R.D. at 119. It consists of just two individual investors. *See also Peters*, 2012 WL 946875 at *7 ("[C]ourts appear to generally agree that a group comprising five or fewer members is appropriate[.]"). Second, the two filed a lead plaintiff motion together, and have demonstrated their ability to work cooperatively. *See* Dkt. 30, Ex. D ("Joint Declaration"). They have communicated with each other through counsel. *Id.* And each professes to be united in their "shared belief in the merits of this action; our shared interest in prosecuting the case in a collaborative and likeminded manner; our understanding of the fiduciary obligations of Lead Plaintiffs; and our preparedness to supervise counsel and undertake all actions necessary to ensure that the Class's claims will be zealously and efficiently litigated." *Id.* at 2. This sufficiently "demonstrate[s] their intent to participate directly in this litigation and their willingness and ability to serve as class representatives." *Janbay*, 272 F.R.D. at 119. Third, there is no indication that the group was formed in bad faith. *See Peters*, 2012 WL 946875, at *9 (contrasting "a group that is able to obtain lead plaintiff status only by aggregating the much smaller losses of a number of class members," which "potentially runs afoul" of the PSLRA, with one that "comprises the class members with, far and away, the largest financial interest of any individual or group (that has otherwise come forward)," where the PSLRA's policy is "not disserved by allowing those

individuals to join together"). There is, for example, no suggestion that the group was formed to box out an outside candidate for lead plaintiff; on the contrary, had the group not been formed, the losses suffered by both Li and Xu would have been the first and second highest among all movants.

In sum, all considerations favor the Xu Group, the group of individuals with, by far, the largest losses.

## C. Rule 23 Requirements

The PSLRA's final requirement is that the proposed lead plaintiffs satisfy Rule 23's requirements for class certification: numerosity, commonality, typicality, and adequacy. At this early stage of litigation, however, "only the last two factors—typicality and adequacy—are pertinent." *Bo Young Cha*, 2012 WL 2025850, at *6 (quoting *Constance Sczesny Tr. v. KPMG LLP*, 223 F.R.D. 319, 324 (S.D.N.Y. 2004)).

Lead plaintiffs' claims are typical where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Sgalambo v. McKenzie*, 268 F.R.D. 170, 173–74 (S.D.N.Y. 2010) (citations omitted). A lead plaintiff is adequate where it "does not have interests that are antagonistic to the class that he seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class that he seeks to represent." *Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006) (citing *Dietrich v. Bauer*, 192 F.R.D. 119, 126 (S.D.N.Y. 2000)). "The claims of [the prospective lead plaintiffs] are typical of the class because their claims and injuries arise from the same conduct from which the other class members' claims and injuries arise." *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 49–50 (S.D.N.Y. 1998) (citations omitted).

Wang contests Xu's typicality because Xu also engaged in "extensive and unique options trading." Dkt. 37 at 12. But Xu's losses as claimed stem from the same alleged misstatements and omissions as the other movants, and there is no indication that the theory on which he will rely to remedy his losses will differ from any other plaintiff. *All* of Xu's claimed losses in this are attributable to his ADS trades. Even were the court to discount Xu's successful call and put trades, which significantly offset those ADS trade losses, Xu's total losses would be $ 318,458, significantly higher than any other movant's, including Wang's. Dkt. 30, Ex. A. *Compare with Di Scala v. ProShares Ultra Bloomberg Crude Oil*, No. 20 Civ. 5865 (NRB), 2020 WL 7698321, at *3 (S.D.N.Y. Dec. 28, 2020) (setting aside lead plaintiff movant where bulk of losses were attributable to put trades). And Wang has not alleged that Li, who has the highest losses of any movant, is in any way atypical from the class.

Wang also takes issue with the Xu Group's mechanism for resolving disputes among Xu and Li, which provides that in the event of a disagreement, a majority vote will be taken in which Xu's and Li's votes are proportionate to the losses they incurred during the class period.[5] Effectively, Li, who suffered the largest loss, would be the deciding vote in a dispute. But contrary to Wang's assertion, this voting procedure is consistent with the PSLRA's presumption that the movant with the largest financial interest will control the litigation, as Li is the plaintiff with the largest financial loss of all lead plaintiff movants. *See In re LightInTheBox Holding Co., Ltd. Sec. Litig.*, No. 13 Civ. 6016 (PKC), 2013 WL 6145114, at *2 (S.D.N.Y. Nov. 21, 2013).

---

[5] The Xu Group's Joint Declaration also states that they "agree to make all efforts, in good faith, to reach consensus with respect to all litigation decisions, and to that end will consult with our counsel as we deem necessary to fulfill our fiduciary obligations to the Class . . . . We recognize that even in the event of such a disagreement, the ultimate decision will necessarily be informed by consulting one another and our counsel." Dkt. 30, Ex. D.

Finally, Wang challenges the Xu Group's adequacy on the ground that their PSLRA certifications were not properly sworn under penalty of perjury "under the laws of the United States of America," pursuant to 28 U.S.C. § 1746(1), which requires inclusion of that language when executed outside the United States.[6] But "the Court has discretion in the lead plaintiff appointment process and can decide to use or ignore the alleged technical (as opposed to substantive) inadequacy of a certificate as a determinative factor." *Vladimir v. Bioenvision, Inc.*, No. 07 Civ. 6416 (SHS) (AJP), 2007 WL 4526532, at *9 (S.D.N.Y. Dec. 21, 2007); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 407 n.19 (S.D.N.Y. 2004) ("Although the procedures contemplated by the PSLRA are well defined, district courts have not followed them invariably, especially when doing so would fail the court's ultimate obligation to appoint as lead plaintiff the member or members of the purported plaintiff class who are most capable of representing the interests of the class members." (quotation marks omitted)). Here, this defect is not significant or substantive, and, indeed, has since been cured: On November 3, 2021, the Court received the Xu Group's revised PSLRA certifications, this time containing the properly worded oath. *See* Dkt. 39, Ex. 1.

Because the group consisting of Xu and Li satisfies all PSLRA requirements as of this early stage, the Court appoints them co-lead plaintiffs.

### III. Appointing Lead Counsel

The most adequate plaintiff may retain counsel to represent the class, subject to the Court's approval. *Id.* § 78u–(4)(a)(3)(B)(v). The Xu Group has selected the law firm of Pomerantz LLP ("Pomerantz") as lead counsel. Having reviewed the firm's submissions as to its

---

[6] Both Xu and Li properly swore "under the laws of the United States of America" that their Joint Declaration, Dkt. 30, Ex. D, was true and correct.

14

pertinent background and experience, including its experience litigating securities class actions, the Court finds the firm qualified to serve as lead counsel. Accordingly, the Court appoints Pomerantz as lead counsel.

## CONCLUSION

For the reasons set out above, the Court grants the Xu Group's motion for appointment as lead plaintiffs, and appoints Pomerantz as lead counsel.

The Clerk of the Court is respectfully directed to terminate the motions pending at docket entries 13, 16, 19, 21, 27, and 39.

The Court directs the parties to meet and confer and, by **November 15, 2021**, to file a joint letter setting out an efficient proposed schedule for next steps in this case, including proposed dates for the filing of (1) a consolidated amended complaint and (2) defendants' response. If defendants anticipate that their response will take the form of a motion to dismiss, the parties shall include proposed dates for the opposition and reply briefs as well.

SO ORDERED.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Dated: November 8, 2021
New York, New York